FLORENCE I. MERKEL, individually and as executrix, &c.,

*v.*

WILLIAM MERKEL.

[Submitted September 12th, 1916.   Decided November 21st, 1916.]

1. Under the facts in this case the compromise agreement will not be set aside, the complainant being guilty of laches.

2. It will not be set aside because the counsel of the complainant had given her mistaken advice, the facts upon which said advice was founded being all the time in the possession of the complainant.

On bill, &c.

*Mr. Herbert C. Gilson,* for the complainant.

*Messrs. Raymond, Mountain, Van Blarcom & Marsh,* for the defendant.

GRIFFIN, V. C.

The bill in this cause is filed (1) to set aside a compromise agreement which resulted in the settlement of a suit at law; (2) to compel the return of moneys paid thereunder, and (3) to restrain the disposal of the notes given under the agreement.

It seems that John G. Merkel in his lifetime was the holder of two hundred and forty-eight shares of the capital stock of the John G. Merkel Company, with a capital issued of two hundred and fifty shares; he practically owned the corporation, the other two shares being held by the present complainant and one Julia Voight to qualify them as directors.   Prior to December 24th, 1903, the defendant, who was a brother of John G. Merkel, was in the employ of the company as salesman.   On the last-mentioned day an agreement was entered into between John and William, under which John agreed to transfer thirty shares of the capital stock of the company to William if he continued in

the employ of the company for five years, from January 1st, 1904, and during that time devoted his full time and energy in behalf of the company, and also upon condition that the capital stock of the company should, on January 1st, 1909, reach the book value of $400 per share, and if it did not reach such book value, then the said stock should remain the sole property of John, in which latter case William should receive (in cash) the difference between the book value of the shares on May 1st, 1904, and January 1st, 1909—that is, if the book value had increased. On July 3d, 1910, John G. Merkel died, leaving a will in which he appointed the complainant, who was his wife, executrix. The defendant continued in the employ of the company from the time of the signing of the agreement until about November, 1912 (erroneously alleged in the bill to be November 4th, 1914), when he was either discharged or voluntarily left the employ of the company. The complainant in her bill alleges both that he was discharged and also that he left voluntarily. The defendant says that he was discharged.

The defendant, on February 5th, 1913, demanded that the complainant transfer to him the thirty shares of stock under the agreement, or the equivalent thereof in cash. This she declined to do, whereupon defendant, on February 28th, 1913, began suit in the Essex circuit court against the complainant, alleging performance of the agreement on his part, and the non-performance on the part of the complainant here, demanding damages in the sum of $15,000. The complainant here answered, denying generally that defendant performed, and also set up as a defence that on February 5th, 1913, the day that the plaintiff demanded said shares of stock, the same were not of the value of $400 per share, nor that they were worth anything near $400 per share, and denied that the plaintiff (this defendant) was entitled to said thirty shares of stock. She also says that she refused to deliver the shares of stock because the plaintiff, having broken his contract in many and divers respects, was not entitled to them.

When the case was about to be reached for trial, in December, 1914, they compromised their differences for the sum of $6,000. The compromise provided that $1,000 should be paid in cash,

and fifty promissory notes, in the sum of $100 each, payable monthly, should be given for the balance. The cash was paid, the notes delivered, the suit was discontinued and a release was given by the defendant here to the complainant. There appears to have been numerous efforts to compromise before this time, which failed; and, apparently, the compromise was only effected when the complaiant here was subpœnaed by the defendant (the plaintiff in the law suit) to produce her books in the law court, to the end that he might prove the book value of this stock. Two days after this subpœna was issued the case was settled. She continued to pay the notes, in accordance with the agreement, down to about July, 1915, during which time she paid seventeen, thus making the total amount paid under the agreement $2,700.

The bill, after referring to the suit at law and the issues raised therein, bases the right to relief here upon two grounds—*first,* newly-discovered evidence, which, if known at the time the suit at law was pending, would have enabled her to successfully defend the action, and *second,* that she consulted counsel learned in the law and was mistakenly and illegally advised by him that William had a lawful cause of action against her for the thirty shares of stock, or for damages for breach of the agreement, and advised her to compromise.

*First.* Is the evidence newly discovered?

She says that on November 4th, 1914 (should be February, 1913), when William demanded the thirty shares, or the equivalent thereof in cash, he falsely and fraudulently represented to the complainant here that he had devoted his full and undivided time and energy, &c., to the company during the term of the five years mentioned in the agreement; that the capital stock had reached a book value of $400 for each share; that the book value of said stock had increased since May 1st, 1904, to $400, on January 1st, 1909, and was then of that value, which statements were false and untrue; and that, relying upon such statements and mistaken and illegal advice, she entered into the compromise settlement.

That she did not rely upon the statements made by the defendant is quite evident from her affidavit made in this cause on

the 5th day of September, 1916, in which she says that during
the five years he had not devoted all his time to the business
because he had been discharged during that time several times by
John; that at the urgent solicitation of the mother of John and
William, in the presence of the complainant and her daughter,
Julia, William was taken back; and William admitted that he
had not devoted his entire time to the said business, and would
do so in the future. A similar affidavit is made by Julia. She,
therefore, could not have been deceived by any such statement
alleged to have been made by William, because, if her story be
true, she knew the contrary to be the truth; William, however,
denies her story.

This leaves, as the remaining ground, the alleged deception
practiced by William in securing the compromise, namely, the
representation that the stock had increased in value to $400 per
share on January 1st, 1909. In dealing with this matter, it
must be borne in mind that this suit was in progress in a court
of law for almost two years before the compromise was reached.
It was necessary for the defendant in the law suit (the com-
plainant here), in preparing for trial, to ascertain this book
value from the books of the company. It was the principal issue
involved in that suit, according to the pleadings. The books
were in her possession. She and her counsel were in a position
where the book value could be easily ascertained. Thus, it was
unnecessary for the complainant to rely upon any statement
which the plaintiff in the law suit might make as to this book
value. Therefore, it would seem to have been gross negligence
on the part of the complainant not to have known the book
value and be acquainted with the facts touching it.

After the settlement she continued to live up to the terms of
the compromise agreement for a further period of about eighteen
months, when, as she says, she "has just discovered and been ad-
vised of the false representations and statements and the mistake
in law and advice as aforesaid." During the period from the
settlement until the bill was filed here she had the books in her
custody, and could at any time have ascertained the truth of the
alleged representations. Now, at the end of three and a half
years after the suit at law was begun, and eighteen months after

the compromise was effected, she comes into this court seeking to set aside the compromise agreement·on the ground that she but recently learned that the statements of the defendant as to book value were false.

To entertain such a complaint upon such facts would be most intolerable. There should be a limit to litigation; it is not the policy of equity to aid in its prolongation.

The case as presented is somewhat analogous to an application for a new trial on the ground of newly-discovered evidence. If the complainant went to trial in her case at law, having in her possession the books which would tend to prove the book value, but did not produce them, and judgment went against her, she could not obtain a new trial, because such evidence would not be considered as newly discovered, nor such that, by the use of ordinary care and diligence, she might not have produced at the trial. *Servis ·v. Cooper, 33 N. J. Law ·68; Stein* v. *Cuff, 76 N. J. Eq. 277; Hannan* v. *Maxwell, 31 N. J. Eq. 318; Powers* v. *Butler, 4 N. J. Eq. 465; 4 Pom. Eq. Jur. (3d ed.)* § *1364.*

Here, however, instead of going to trial, the parties substituted their compromise agreement for the· judgment of the court and jury. If complainant is in such laches that a court of law would not grant a new trial on the grounds above stated, if the suit at law had proceeded to judgment against the complainant, why should a court of equity, under similar circumstances, set aside the solemn agreement of the parties settling their· suit at law, when it is apparent that her lack of knowledge of the facts was due to her gross laches in· not examining the books in her custody, which would then have given her all the information on the subject she now possesses?

*Second.* Is the case of the complainant˝aided by the allegation that ·she was mistakenly· and illegally advised by counsel?

This advice, I will assume, was given by counsel without knowledge of what the books in possession of his client might prove. It does not appear by the bill that counsel had seen the books; the bill does not allege that he had not seen them; it is quite plain,·however, that he was charged with notice of their existence when the complainant here was subpœnaed to produce the books at the trial. Under such circumstances, the case is

quite like that of *Stein* v. *Cuff, supra,* where an attorney, knowing of the importance of a certain witness and the value of certain papers, proceeded to trial without them, with the result that judgment passed against his client. A new trial was denied at law and relief was refused in equity. To the same effect is *4 Pom. Eq. Jur. § 1364.*

The order to show cause will be discharged.